

1 | Samuel F. Bull, In Pro Se
618 W. Hazel
2 | Mount Vernon, WA 98273
360 540 0996
3 | bullheimer@hotmail.com

4

5 | **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
6 | **AT TACOMA**

7 | SAMUEL F. BULL,                             Case No.: 2:22-cv-00101-JCC-JRC

8 |          Plaintiff,

9 | vs.                                          OPPOSITION TO MAGISTRATE'S
REPORT AND RECOMMENDATION,
10 | UNITED STATES OF AMERICA, PRESIDENT    OR, IN THE ALTERNATIVE, FOR LEAVE TO
JOE BIDEN AND U.S. ATTORNEY GENERAL    AMEND AND SUPPLEMENT COMPLAINT
11 | MERRICK GARLAND,

12 |          Defendants

13

14 |          COMES NOW, the Plaintiff above named, a U.S. citizen, in Response to

15 | Magistrate's Recommendation to this Court to dismiss this Complaint.  Magistrate claims that I,

16 | Plaintiff, do not have standing, because my injury is not particularized, or I am asserting the

17 | Rights of a Third Person. Firstly, I am not asserting the Rights of a Third Person, although it is

18 | asserted that those rights of a Mr. Assange are being violated.  I am asserting that MY Rights

19 | are being violated. That I, myself, have, and continue to have, my Right to a Free Press

20 | obliterated by what I feel is the Unconstitutional law of the 1917 Espionage Act. This law was

21 | not ruled Unconstitutional in New York Times Co. vs. United States, 403 U.S. 713 (1971), as

22 | the primary issue was an Injunction: Whether or not the NY Times should be restrained from

23 | publishing top secret documents. However, in review of the Majority Opinions in NY Times, *Id*

24 | p 403, (Exhibit "A"), which I wholeheartedly encourage the Court to re-acquaint himself with,

25 | if need be.  Reading the contempt Justices Black and Douglas felt for the Espionage Act, it is

26 | time to rule that the Espionage Act of 1917 is in fact Unconstitutional, especially when it is

27

28 | OPPOSITION TO MAGISTRATE'SREPORT AND RECOMMENDATION,OR, IN THE ALTERNATIVE, FOR
LEAVE TO AMEND AND SUPPLEMENT COMPLAINT - 1

applied against the Press, like Julian Assange, the subject of this Complaint, who has received

numerous journalistic awards, (Exhibit "E"), as well as those who may not actually be

employed by media outlets, or employed as actual journalists, like Daniel Hale, who exposed

civilian targets of US drones, and other whistleblowers currently serving time for violating the

Espionage Act.  For some background on Assange please see Exhibit "B" The Execution of

Julian Assange", by Chris Hedges, Pulitzer Prize winning journalist; and, Exhibit "C" an

interview with Nils Melzer, U.N. Special Rapporteur on Torture.

        As for the issue of my standing, See Va. Pharmacy Bd. v. Va. Consumer Council,

425 US 748 , 757 - Supreme Court 1976: "Freedom of speech presupposes a willing

speaker. But where a speaker exists, as is the case here, the protection afforded is to the

communication, to its source and to its recipients both. This is clear from the decided

cases.  In Lamont v. Postmaster General, 381 U. S. 301 (1965), the Court upheld the First

Amendment rights of citizens to receive political publications sent from abroad. More

recently, in Kleindienst v. Mandel, 408 U. S. 753, 762-763 (1972), we acknowledged that

this Court has referred to a First Amendment right to "receive information and ideas,"

and that freedom of speech "`necessarily protects the right to receive' ".

        Further, "The Supreme Court of the United States has explained that standing

requirements are somewhat relaxed in First Amendment cases:

> "Even where a First Amendment challenge could be brought by one actually
> engaged in protected activity, there is a possibility that, rather than risk
> punishment for his conduct in challenging the statute, he will refrain from
> engaging further in the protected activity. Society as a whole then would be the
> loser. Thus, when there is a danger of chilling free speech, the concern that
> constitutional adjudication be avoided whenever possible may be outweighed by
> society's interest in having the statute challenged. Secretary of State of Md. v.
> Joseph H. Munson Co., Inc., 467 U.S. 947, 956, (1984)."

OPPOSITION TO MAGISTRATE'SREPORT AND RECOMMENDATION,AND, MOTION FOR LEAVE TO
AMEND AND SUPPLEMENT COMPLAINT - 2

1        This issue may indeed concern a 'generalized grievance' and 'common to all members of

2  the public.  But again, we are talking about the First Amendment Right to Free Speech, and to

3  quote again Mr. Justice Black and Mr. Justice Douglas at 403 U.S. 717 "The Press was to serve

4  the governed, not the governors.  The Government's power to censor the press was abolished so

5  that the press would remain forever free to censure the government.  The press was protected so

6  that it could bare the secrets of government and inform the people. Only a free and unrestrained

7  press can effectively expose deception in government. And paramount among the responsibilities

8  of a free press is the duty to prevent any part of the government from deceiving the people and

9  sending them off to distant lands to die of foreign fevers and foreign shot and shell."

10       The use of the Espionage Act has silenced whistleblowers preventing me personally from

11  learning, among other things, who the people are who fired drones that killed Iraqi and Afghani

12  civilians, and why those people were never charged, or who is responsible for those crimes being

13  swept under the carpet. It prevents me from knowing who the pilots of the helicopters in the

14  Collateral Damage video were or why they were never charged with any crimes. It prevents me

15  from knowing who ordered this war crime, and who stopped any investigation of this. It prevents

16  me and other citizens from knowing who got the trillions of dollars the U.S. Government spent on

17  rebuilding Afghan infrastructure when it is obvious from conditions there now that we built

18  virtually no infrastructure there. It prevents me from knowing why the U.S. aided in  a coup in

19  Ukraine in 2014, and now, less than one year  after leaving Afghanistan, it is spoiling for a war

20  against Russia, a nuclear power. The amount of criminal activity that has taken place is massive,

21  and I am not privy to the answers that I need to know in order to try and do anything to keep our

22  Government in check, even by something as simple as not voting for the person responsible, or,

23  preventing my 19 year old grandchild from registering for the draft.  Because of the depth and

24  depravity of the U.S. war crimes that Assange revealed, he is being held and tortured for the

25  entire time that he has been in Belmarsh Maximum Security Prison in London England. The U.N.

OPPOSITION TO MAGISTRATE'SREPORT AND RECOMMENDATION,OR, IN THE ALTERNATIVE, FOR
LEAVE TO AMEND AND SUPPLEMENT COMPLAINT - 3

Rapporteur on Torture has testified to this, (again, Exhibit "C"), to the point that Julian has

suffered a stroke at his latest trial. (See Exhibit "D", Article by The Mail, 11 Dec. 21).

Pertaining to my damages Elrod v. Burns, 427 US 347,373 - Supreme Court 1976

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury."

**CONCLUSION**

Plaintiff requests the Court Rule as follows:

1. That the Magistrate Judge's Recommendation be set aside, and Plaintiff's Motion to set this

    case for trial be granted;

2. That the Court issue a ruling that the Espionage Act of 1917 is Unconstitutional, and;

3. That the Court issue an Injunction forcing Defendants Attorney General Merrick Garland,

    and President Joseph Biden Jr., to take action to drop all charges against Julian Assange for

    violating the Espionage Act, because said Act is, on its face, in violation of the First

    Amendment, by keeping Plaintiff and the rest of the pubic, from obtaining the truth about

    "deception in government" (again from NY Times, Majority Opinion, Justices Black and

    Douglas).

IN THE ALTERNATIVE, Plaintiff Motions for Leave to Amend and Supplement this

Complaint in the event the Court chooses to follow Magistrate's Recommendation, to

procure counsel to conform this Complaint to the Court's satisfaction. This should be

allowed for the reasons listed in Puget Soundkeepers Alliance and The Sierra Club vs Scott

Pruitt, USDC, Western Division, at Seattle, **Judge Coughenour** presiding, Case No.

2:15-cv-01342-JCC (April 2018), Pp 5-8, , "Federal Rule of Civil Procedure 15(a)(2)

allows for the amendment of pleadings with leave of court, or with the opposing

counsel's written consent, before trial. Fed. R. Civ. P. 15(a)(2). The Rule further

OPPOSITION TO MAGISTRATE'SREPORT AND RECOMMENDATION,OR, IN THE ALTERNATIVE, FOR
LEAVE TO AMEND AND SUPPLEMENT COMPLAINT - 4

provides that "[t]he court should freely give leave when justice so requires." Id. In

addition, Rule 15(d) specifically allows the filing of supplemental pleadings to allege

new facts that occur after the filing of original pleadings. Rule 15(d) states that "[o]n

motion and reasonable notice, the court may, on just terms, permit a party to serve a

supplemental pleading setting out any transaction, occurrence, or event that

happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

Because Rule 15(a) instructs that leave to amend pleadings should be "freely" given,

the standard of review is liberal. Indeed, the Ninth Circuit has instructed that the rule

"should be interpreted with 'extreme liberality,'" Jackson v. Bank of Hawaii, 902

F.2d 1385, 1387 (9th Cir. 1990) (quoting United States v. Webb, 655 F.2d 977, 979

(9th Cir.1981)), and "[a]n outright refusal to grant leave to amend without a

justifying reason is ... an abuse of discretion." Smith v. Constellation Brands, Inc.,

2018 WL 991450, at *2 (9th Cir. Feb. 21, 2018) (quoting Leadsinger, Inc. v. BMG

Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008).   Plaintiff begs the Court not to close

this case as Mr. Assange can die at any moment, and Plaintiff believes this avenue to be the

only one available to save his life.


Respectfully submitted this 28th day of February, 2022



_____

Samuel F. Bull, In Pro Se

1   Samuel F. Bull
    618 W. Hazel
2   Mount Vernon, WA 98273
    360 540 0996
3   bullheimer@hotmail.com

4                       **UNITED STATES DISTRICT COURT**
                      **WESTERN DISTRICT OF WASHINGTON**
5                                **AT TACOMA**

6

7
    SAMUEL F. BULL,                          Case No.: 2:22-cv-00101-JCC-JRC
8
                    Plaintiff, in Pro Se,
9
    vs.                                       ORDER GRANTING LEAVE TO AMEND AND
10                                            SUPPLEMENT COMPLAINT TO PLAINTIFF
    THE UNITED STATES OF AMERICA, PRESIDENT
11  JOE BIDEN JR., AND U.S. ATTORNY GENERAL
    MERRICK GARLAND
12

13                  Defendants,

14

15          Pursuant to Federal Rule of Civil Procedure 15 and Local Rule 15, as presented in Plaintiffs'

16  Opposition, Alternative Conclusion, Motion for leave to amend and supplement the Complaint in the above-

17  captioned case for Plaintiff to procure effective counsel is hereby GRANTED.  Plaintiff is given _____ days, until the

18  _____ of _____, 2022.

19          Clerk is directed to send a copy of this Order to Chief Magistrate Judge J. Richard Creatura.

20          Dated this _____ day of March,  2022.

21

22                                            John C. Coughenour,
23                                            United States District Judge

24

25

26

27

28

    ORDER GRANTING LEAVE TO AMEND AND SUPPLEMENT COMPLAINT TO PLAINTIFF - 1

# U.S. Supreme Court

**New York Times Co. v. United States, 403 U.S. 713 (1971)**

**New York Times Co. v. United States**

**No. 1873**

**Argued June 26, 1971**

**Decided June 30, 1971403 U.S. 713ast|>***

**403 U.S. 713**

*CERTIORARI TO THE UNITED STATES COURT OF APPEALS*

*FOR THE SECOND CIRCUIT*

*Syllabus*

The United States, which brought these actions to enjoin publication in the New York Times and in the Washington Post of certain classified material, has not met the "heavy burden of showing justification for the enforcement of such a [prior] restraint."

No. 1873, 44 F.2d 544, reversed and remanded; No. 1885, ____ U.S.App.D.C. ____, 446 F.2d 1327, affirmed.

Page 403 U. S. 714

PER CURIAM

We granted certiorari in these cases in which the United States seeks to enjoin the New York Times and the Washington Post from publishing the contents of a classified study entitled "History of U.S. Decision-Making Process on Viet Nam Policy." *Post,* pp. 942, 943.

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U. S. 58, 372 U. S. 70 (1963); *see also Near v. Minnesota,* 283 U. S. 697 (1931). The Government "thus carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin v. Keefe,* 402 U. S. 415, 402 U. S. 419 (1971). The District Court for the Southern District of New York, in the *New York Times* case, and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit, in the *Washington Post* case, held that the Government had not met that burden. We agree.

The judgment of the Court of Appeals for the District of Columbia Circuit is therefore affirmed. The order of the Court of Appeals for the Second Circuit is reversed, and the case is remanded with directions to enter a judgment affirming the judgment of the District Court for the Southern District of New York. The stays entered June 25, 1971, by the Court are vacated. The judgments shall issue forthwith.

*So ordered.*

.* Together with No. 1885, *United States v. Washington Post Co. et al.,* on certiorari to the United States Court of Appeals for the District of Columbia Circuit.

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS joins, concurring.

I adhere to the view that the Government's case against the Washington Post should have been dismissed, and that the injunction against the New York Times should have been vacated without oral argument when the cases were first presented to this Court. I believe

Page 403 U. S. 715

that every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment. Furthermore, after oral argument, I agree completely that we must affirm the judgment of the Court of Appeals for the District of Columbia Circuit and reverse the judgment of the Court of Appeals for the Second Circuit for the reasons stated by my Brothers DOUGLAS and BRENNAN. In my view, it is unfortunate that some of my Brethren are apparently willing to hold that the publication of news may sometimes be enjoined. Such a holding would make a shambles of the First Amendment.

Our Government was launched in 1789 with the adoption of the Constitution. The Bill of Rights, including the First Amendment, followed in 1791. Now, for the first time in the 182 years since the founding of the Republic, the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the publication of current news of vital importance to the people of this country.

In seeking injunctions against these newspapers, and in its presentation to the Court, the Executive Branch seems to have forgotten the essential purpose and history of the First Amendment. When the Constitution was adopted, many people strongly opposed it because the document contained no Bill of Rights to safeguard certain basic freedoms. [Footnote 1] They especially feared that the

Page 403 U. S. 716

new powers granted to a central government might be interpreted to permit the government to curtail freedom of religion, press, assembly, and speech. In response to an overwhelming public clamor, James Madison offered a series of amendments to satisfy citizens that these great liberties would remain safe and beyond the power of government to abridge. Madison proposed what later became the First Amendment in three parts, two of which are set out below, and one of which proclaimed:

"The people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments, *and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable.* [Footnote 2]"

(Emphasis added.) The amendments were offered to curtail and restrict the general powers granted to the Executive, Legislative, and Judicial Branches two years before in the original Constitution. The Bill of Rights changed the original Constitution into a new charter under which no branch of government could abridge the people's freedoms of press, speech, religion, and assembly. Yet the Solicitor General argues and some members of the Court appear to agree that the general powers of the Government adopted in the original Constitution should be interpreted to limit and restrict the specific and emphatic guarantees of the Bill of Rights adopted later. I can imagine no greater perversion of history. Madison and the other Framers of the First Amendment, able men

Page 403 U. S. 717

EX H. "A"

that they were, wrote in language they earnestly believed could never be misunderstood: "Congress shall make no law . . . abridging the freedom . . . of the press. . . ." Both the history and language of the First Amendment support the view that the press must be left free to publish news, whatever the source, without censorship, injunctions, or prior restraints.

In the First Amendment, the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy. The press was to serve the governed, not the governors. The Government's power to censor the press was abolished so that the press would remain forever free to censure the Government. The press was protected so that it could bare the secrets of government and inform the people. Only a free and unrestrained press can effectively expose deception in government. And paramount among the responsibilities of a free press is the duty to prevent any part of the government from deceiving the people and sending them off to distant lands to die of foreign fevers and foreign shot and shell. In my view, far from deserving condemnation for their courageous reporting, the New York Times, the Washington Post, and other newspapers should be commended for serving the purpose that the Founding Fathers saw so clearly. In revealing the workings of government that led to the Vietnam war, the newspapers nobly did precisely that which the Founders hoped and trusted they would do.

The Government's case here is based on premises entirely different from those that guided the Framers of the First Amendment. The Solicitor General has carefully and emphatically stated:

"Now, Mr. Justice [BLACK], your construction of . . . [the First Amendment] is well known, and I certainly respect it. You say that no law means no law, and that should be obvious. I can only

Page 403 U. S. 718

say, Mr. Justice, that to me it is equally obvious that 'no law' does not mean 'no law,' and I would seek to persuade the Court that that is true. . . . [T]here are other parts of the Constitution that grant powers and responsibilities to the Executive, and . . . the First Amendment was not intended to make it impossible for the Executive to function or to protect the security of the United States. [Footnote 3]"

And the Government argues in its brief that, in spite of the First Amendment,

"[t]he authority of the Executive Department to protect the nation against publication of information whose disclosure would endanger the national security stems from two interrelated sources: the constitutional power of the President over the conduct of foreign affairs and his authority as Commander-in-Chief. [Footnote 4]"

In other words, we are asked to hold that, despite the First Amendment's emphatic command, the Executive Branch, the Congress, and the Judiciary can make laws enjoining publication of current news and abridging freedom of the press in the name of "national security." The Government does not even attempt to rely on any act of Congress. Instead, it makes the bold and dangerously far-reaching contention that the courts should take it upon themselves to "make" a law abridging freedom of the press in the name of equity, presidential power and national security, even when the representatives of the people in Congress have adhered to the command of the First Amendment and refused to make such a law. [Footnote 5] *See* concurring opinion of MR. JUSTICE DOUGLAS,

Page 403 U. S. 719

*post* at 403 U. S. 721-722. To find that the President has "inherent power" to halt the publication of news by resort to the courts would wipe out the First Amendment and destroy the fundamental liberty and security of the very people the Government hopes to make "secure." No one can read the history of the adoption of the First Amendment without being convinced beyond any doubt that it was

— 3 —

injunctions like those sought here that Madison and his collaborators intended to outlaw in this Nation for all time.

The word "security" is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic. The Framers of the First Amendment, fully aware of both the need to defend a new nation and the abuses of the English and Colonial governments, sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged. This thought was eloquently expressed in 1937 by Mr. Chief Justice Hughes -- great man and great Chief Justice that he was -- when the Court held a man could not be punished for attending a meeting run by Communists.

"The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free

Page 403 U. S. 720

assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government. [Footnote 6]"

[Footnote 1]

In introducing the Bill of Rights in the House of Representatives, Madison said:

"[B]ut I believe that the great mass of the people who opposed [the Constitution] disliked it because it did not contain effectual provisions against the encroachments on particular rights. . . ."

1 Annals of Cong. 433. Congressman Goodhue added:

"[I]t is the wish of many of our constituents that something should be added to the Constitution to secure in a stronger manner their liberties from the inroads of power."

*Id.* at 426.

[Footnote 2]

The other parts were:

"The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed."

"The people shall not be restrained from peaceably assembling and consulting for their common good, nor from applying to the Legislature by petitions, or remonstrances, for redress of their grievances."

1 Annals of Cong. 434.

[Footnote 3]

Tr. of Oral Arg. 76.

[Footnote 4]

Brief for the United States 13-14.

[Footnote 5]

*Compare* the views of the Solicitor General with those of James Madison, the author of the First Amendment. When speaking of the Bill of Rights in the House of Representatives, Madison said:

"If they [the first ten amendments] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights."

1 Annals of Cong. 439.

[Footnote 6]

*De Jonge v. Oregon,* 299 U. S. 353, 299 U. S. 365.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK joins, concurring.

While I join the opinion of the Court, I believe it necessary to express my views more fully.

It should be noted at the outset that the First Amendment provides that "Congress shall male no law . . . abridging the freedom of speech, or of the press." That leaves, in my view, no room for governmental restraint on the press. [Footnote 2/1]

There is, moreover, no statute barring the publication by the press of the material which the Times and the Post seek to use. Title 18 U.S.C. § 793(e) provides that

"[w]hoever having unauthorized possession of, access to, or control over any document, writing . . . or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates . . . the same to any person not entitled to receive it . . . [s]hall be fined

Page 403 U. S. 721

not more than $10,000 or imprisoned not more than ten years, or both."

The Government suggests that the word "communicates" is broad enough to encompass publication.

There are eight sections in the chapter on espionage and censorship, §§ 792-799. In three of those eight, "publish" is specifically mentioned: § 794(b) applies to

"Whoever, in time of war, with intent that the same shall be communicated to the enemy, collects, records, *publishes,* or communicates . . . [the disposition of armed forces]."

Section 797 applies to whoever "reproduces, *publishes,* sells, or gives away" photographs of defense installations.

Section 798, relating to cryptography, applies to whoever: "communicates, furnishes, transmits, or otherwise makes available . . . or *publishes*" the described material. [Footnote 2/2] (Emphasis added.)

Thus, it is apparent that Congress was capable of, and did, distinguish between publishing and communication in the various sections of the Espionage Act.

The other evidence that § 793 does not apply to the press is a rejected version of § 793. That version read:

"During any national emergency resulting from a war to which the United States is a party, or from threat of such a war, the President may, by proclamation, declare the existence of such emergency and, by proclamation, prohibit the publishing or communicating of, or the attempting to publish or communicate any information relating to the national defense which, in his judgment, is of such character that it is or might be useful to the

Page 403 U. S. 722

enemy."

55 Cong.Rec. 1763. During the debates in the Senate, the First Amendment was specifically cited, and that provision was defeated. 55 Cong.Rec. 2167.

Judge Gurfein's holding in the *Times* case that this Act does not apply to this case was therefore preeminently sound. Moreover, the Act of September 23, 1950, in amending 18 U.S.C. § 793 states in § 1(b) that:

"Nothing in this Act shall be construed to authorize, require, or establish military or civilian censorship or in any way to limit or infringe upon freedom of the press or of speech as guaranteed by the Constitution of the United States and no regulation shall be promulgated hereunder having that effect."

64 Stat. 987. Thus, Congress has been faithful to the command of the First Amendment in this area.

So any power that the Government possesses must come from its "inherent power."

The power to wage war is "the power to wage war successfully." *See Hirabayashi v. United States,* 320 U. S. 81, 320 U. S. 93. But the war power stems from a declaration of war. The Constitution by Art. I, § 8, gives Congress, not the President, power "[t]o declare War." Nowhere are presidential wars authorized. We need not decide, therefore, what leveling effect the war power of Congress might have.

These disclosures [Footnote 2/3] may have a serious impact. But that is no basis for sanctioning a previous restraint on

Page 403 U. S. 723

the press. As stated by Chief Justice Hughes in *Near v. Minnesota,* 283 U. S. 697, 283 U. S. 719-720:

"While reckless assaults upon public men, and efforts to bring obloquy upon those who are endeavoring faithfully to discharge official duties, exert a baleful influence and deserve the severest condemnation in public opinion, it cannot be said that this abuse is greater, and it is believed to be less, than that which characterized the period in which our institutions took shape. Meanwhile, the administration of government have become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by

miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct."

As we stated only the other day in *Organization for a Better Austin v. Keefe,* 402 U. S. 415, 402 U. S. 419, "[a]ny prior restraint on expression comes to this Court with a "heavy presumption" against its constitutional validity."

The Government says that it has inherent powers to go into court and obtain an injunction to protect the national interest, which, in this case, is alleged to be national security.

*Near v. Minnesota,* 283 U. S. 697, repudiated that expansive doctrine in no uncertain terms.

The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression

Page 403 U. S. 724

of embarrassing information. It is common knowledge that the First Amendment was adopted against the widespread use of the common law of seditious libel to punish the dissemination of material that is embarrassing to the powers-that-be. *See* T. Emerson, The System of Freedom of Expression, c. V (1970); Z. Chafee, Free Speech in the United States, c. XIII (1941). The present cases will, I think, go down in history as the most dramatic illustration of that principle. A debate of large proportions goes on in the Nation over our posture in Vietnam. That debate antedated the disclosure of the contents of the present documents. The latter are highly relevant to the debate in progress.

Secrecy in government is fundamentally anti-democratic, perpetuating bureaucratic errors. Open debate and discussion of public issues are vital to our national health. On public questions, there should be "uninhibited, robust, and wide-open" debate. *New York Times Co. v. Sullivan,* 376 U. S. 254, 376 U. S. 269-270.

I would affirm the judgment of the Court of Appeals in the *Post* case, vacate the stay of the Court of Appeals in the *Times* case, and direct that it affirm the District Court.

The stays in these cases that have been in effect for more than a week constitute a flouting of the principles of the First Amendment as interpreted in *Near v. Minnesota.*

[Footnote 2/1]

*See Beauharnais v. Illinois,* 343 U. S. 250, 343 U. S. 267 (dissenting opinion of MR. JUSTICE BLACK), 284 (my dissenting opinion); *Roth v. United States,* 354 U. S. 476, 354 U. S. 508 (my dissenting opinion which MR. JUSTICE BLACK joined); *Yates v. United States,* 354 U. S. 298, 354 U. S. 339 (separate opinion of MR. JUSTICE BLACK which I joined); *New York Times Co. v. Sullivan,* 376 U. S. 254, 376 U. S. 293 (concurring opinion of MR. JUSTICE BLACK which I joined); *Garrison v. Louisiana,* 379 U. S. 64, 379 U. S. 80 (my concurring opinion which MR. JUSTICE BLACK joined).

[Footnote 2/2]

These documents contain data concerning the communications system of the United States, the publication of which is made a crime. But the criminal sanction is not urged by the United States as the basis of equity power.

[Footnote 2/3]

—7—

There are numerous sets of this material in existence, and they apparently are not under any controlled custody. Moreover, the President has sent a set to the Congress. We start, then, with a case where there already is rather wide distribution of the material that is destined for publicity, not secrecy. I have gone over the material listed in the *in camera* brief of the United States. It is all history, not future events. None of it is more recent than 1968.

MR. JUSTICE BRENNAN, concurring.

# I

I write separately in these cases only to emphasize what should be apparent: that our judgments in the present cases may not be taken to indicate the propriety, in the future, of issuing temporary stays and restraining

Page 403 U. S. 725

orders to block the publication of material sought to be suppressed by the Government. So far as I can determine, never before has the United States sought to enjoin a newspaper from publishing information in its possession. The relative novelty of the questions presented, the necessary haste with which decisions were reached, the magnitude of the interests asserted, and the fact that all the parties have concentrated their arguments upon the question whether permanent restraints were proper may have justified at least some of the restraints heretofore imposed in these cases. Certainly it is difficult to fault the several courts below for seeking to assure that the issues here involved were preserved for ultimate review by this Court. But even if it be assumed that some of the interim restraints were proper in the two cases before us, that assumption has no bearing upon the propriety of similar judicial action in the future. To begin with, there has now been ample time for reflection and judgment; whatever values there may be in the preservation of novel questions for appellate review may not support any restraints in the future. More important, the First Amendment stands as an absolute bar to the imposition of judicial restraints in circumstances of the kind presented by these cases.

# II

The error that has pervaded these cases from the outset was the granting of any injunctive relief whatsoever, interim or otherwise. The entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined "could," or "might," or "may" prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences

Page 403 U. S. 726

may result.* Our cases, it is true, have indicated that there is a single, extremely narrow class of cases in which the First Amendment's ban on prior judicial restraint may be overridden. Our cases have thus far indicated that such cases may arise only when the Nation "is at war," *Schenck v. United States,* 249 U. S. 47, 249 U. S. 52 (1919), during which times

"[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops."

*Near v. Minnesota,* 283 U. S. 697, 283 U. S. 716 (1931). Even if the present world situation were assumed to be tantamount to a time of war, or if the power of presently available armaments would justify even in peacetime the suppression of information that would set in motion a nuclear holocaust,

DECEMBER 14, 2021
# The Execution of Julian Assange
BY CHRIS HEDGES

FacebookTwitterRedditEmail



Photograph Source: Newtown grafitti – CC BY 2.0

Let us name Julian Assange's executioners. Joe Biden. Boris Johnson. Scott Morrison. Teresa May. Lenin Moreno. Donald Trump. Barack Obama. Mike Pompeo. Hillary Clinton. Lord Chief Justice Ian Burnett and Justice Timothy Victor Holroyde. Crown Prosecutors James Lewis, Clair Dobbin and Joel Smith. District Judge Vanessa Baraitser. Assistant US Attorney in the Eastern District of Virginia Gordon Kromberg. William Burns, the director of the CIA. Ken McCallum, the Director General of the UK Security Service or MI5.

Let us acknowledge that the goal of these executioners, who discussed kidnapping and assassinating Assange, has always been his annihilation.

That Assange, who is in precarious physical and psychological health and who suffered a stroke during court video proceedings on October 27, has been condemned to death should not come as a surprise. The ten years he has been detained, seven in the Ecuadorian Embassy in London and nearly three in the high security Belmarsh prison, were accompanied with a lack of sunlight and exercise and unrelenting threats, pressure, anxiety and stress. "His eyes were out of sync, his right eyelid would not close, his memory was blurry," his fiancé Stella Morris said of the stroke.

His steady physical and psychological deterioration has led to hallucinations and depression. He takes antidepressant medication and the antipsychotic quetiapine. He has been observed pacing his cell until he collapses, punching himself in the face and banging his head against the wall. He has spent weeks in the medical wing of Belmarsh. Prison authorities found "half of a razor blade" hidden under his socks. He has repeatedly called the suicide hotline run by the Samaritans because he thought about killing himself "hundreds of times a day." The executioners have not yet completed their grim work. Toussaint L'Ouverture, who led the Haitian independence movement, the only successful slave revolt in human history, was physically destroyed in the same manner, locked by the French in an unheated and cramped prison cell and left to die of exhaustion, malnutrition, apoplexy, pneumonia and probably tuberculosis.

Assange committed empire's greatest sin. He exposed it as a criminal enterprise. He documented its lies, callous disregard for human life, rampant corruption and innumerable war crimes. Republican or Democrat. Conservative or Labour. Trump or Biden. It does not matter. The goons who oversee the empire sing from the same Satanic songbook. Empires always kill those who inflict deep and serious wounds. Rome's long persecution of the Carthaginian general Hannibal, forcing him in the end to commit suicide, and the razing of Carthage repeats itself in epic after epic. Crazy Horse. Patrice Lumumba. Malcolm X. Ernesto "Che" Guevara. Sukarno. Ngo Dinh Diem. Fred Hampton. Salvador Allende. If you cannot be bought off, if you will not be intimidated into silence, you will be killed. The obsessive CIA

attempts to assassinate Fidel Castro, which because none succeeded have a Keystone Cop incompetence to them, included contracting Momo Salvatore Giancana, Al Capone's successor in Chicago, along with Miami mobster Santo Trafficante to kill the Cuban leader, attempting to poison Castro's cigars with a botulinum toxin, providing Castro with a tubercle bacilli-infected scuba-diving suit, booby-trapping a conch shell on the sea floor where he often dived, slipping botulism-toxin pills in one of Castro's drinks and using a pen outfitted with a hypodermic needle to poison him.

The current cabal of assassins hide behind a judicial burlesque overseen in London by portly judges in gowns and white horse-hair wigs mouthing legal Alice-in-Wonderland absurdities. It is a dark reprise of Gilbert and Sullivan's Mikado with the Lord High Executioner drawing up lists of people "who would not be missed."

I watched the latest installment of the Assange show trial via video link on Friday. I listened to the reading of the ruling granting the appeal by the United States to extradite Assange. Assange's lawyers have two weeks to appeal to the Supreme Court, which they are expected to do. I am not optimistic.

Friday's ruling was devoid of legal analysis. It fully accepted the conclusions of the lower court judge about increased risk of suicide and inhumane prison conditions in the United States. But the ruling argued that US Diplomatic Note no. 74, given to the court on February 5, 2021, which offered "assurances" that Assange would be well treated, overrode the lower court's conclusions. It was a remarkable legal non sequitur. The ruling would not have gotten a passing grade in a first-semester law school course. But legal erudition is not the point. The judicial railroading of Assange, which has eviscerated one legal norm after another, has turned, as Franz Kafka wrote, "lying into a universal principle."

The decision to grant the extradition was based on four "assurances" given to the court by the US government.  The two-judge appellate panel ruled that the "assurances" "entirely answer the concerns which caused the judge [in the lower court] to discharge Mr. Assange." The "assurances" promise that Assange will not be subject to Special

Administrative Measures (SAMs) which keep prisoners in extreme isolation and allow the government to monitor conversations with lawyers, eviscerating attorney-client privilege; can, if the Australian his government agrees, serve out his sentence there;  will receive adequate clinical and psychological care; and, pre-trial and post trial, will not be held in the Administrative Maximum Facility (ADX) in Florence, Colorado.

"There is no reason why this court should not accept the assurances as meaning what they say," the judges wrote. "There is no basis for assuming that the USA has not given the assurances in good faith." And with these rhetorical feints the judges signed Assange's death warrant.

None of the "assurances" offered by Biden's Department of Justice are worth the paper they are written on.  All come with escape clauses. None are legally binding. Should Assange do "something subsequent to the offering of these assurances that meets the tests for the imposition of SAMs or designation to ADX" he will be subject to these coercive measures. And you can be assured that any incident, no matter how trivial, will be used, if Assange is extradited, as an excuse to toss him into the mouth of the dragon. Should Australia, which has marched in lockstep with the US in the persecution of their citizen not agree to his transfer, he will remain for the rest of his life in a US prison. But so what. If Australia does not request a transfer it "cannot be a cause for criticism of the USA, or a reason for regarding the assurances as inadequate to meet the judge's concerns," the ruling read. And even if that were not the case, it would take Assange ten to fifteen years to appeal his sentence up to the Supreme Court, more than enough time for the state assassins to finish him off. I am not sure how to respond to assurance number four, stating that Assange will not be held pre-trial in the ADX in Florence. No one is held pre-trail in ADX Florence. But it sounds reassuring, so I guess those in the Biden DOJ who crafted the diplomatic note added it. ADX Florence, of course, is not the only supermax prison in the United States that might house Assange. Assange can be shipped out to one of our other Guantanamo-like facilities. **Daniel Hale**, the former US Air Force intelligence analyst

- 4 -

currently imprisoned for releasing top-secret documents that exposed widespread civilian casualties caused by US drone strikes, has been held at USP Marion, a federal penitentiary in Marion, Illinois, in a Communications Management Unit (CMU) since October. CMUs are highly restrictive units that replicate the near total isolation imposed by SAMs.

The High Court ruling ironically came as Secretary of State Antony Blinken announced at the virtual **Summit for Democracy** that the Biden administration will provide new funding to protect reporters targeted because of their work and support independent international journalism. Blinken's "assurances" that the Biden administration will defend a free press, at the very moment the administration was demanding Assange's extradition, is a glaring example of the rank hypocrisy and mendacity that makes the Democrats, as Glen Ford used to say, "not the lesser evil, but the more effective evil."

Assange is charged in the US under 17 counts of the Espionage Act and one count of hacking into a government computer. The charges could see him sentenced to 175 years in prison, even though he is not a US citizen and WikiLeaks is not a US-based publication. If found guilty it will effectively criminalize the investigative work of all journalists and publishers, anywhere in the world and of any nationality, who possess classified documents to shine a light on the inner workings of power. This mortal assault on the press will have been orchestrated, we must not forget, by a Democratic administration. It will set a legal precedent that will delight other totalitarian regimes and autocrats who, emboldened by the United States, will gleefully seize journalists and publishers, no matter where they are located, who publish inconvenient truths.

There is no legal basis to hold Julian in prison. There is no legal basis to try him, a foreign national, under the Espionage Act. The CIA spied on Assange in the Ecuador Embassy through a Spanish company, UC Global, contracted to provide embassy security. This spying included recording the privileged conversations between Assange and his lawyers. This fact alone invalidates any future trial. Assange, who after seven years in a cramped room without sunlight in the embassy, has been held for nearly three years in a high-security prison in London so

the state can, as Nils Melzer, the UN Special Rapporteur on Torture, has testified, continue the unrelenting abuse and torture it knows will lead to his psychological and physical disintegration. The persecution of Assange is designed to send a message to anyone who might consider exposing the corruption, dishonesty and depravity that defines the black heart of our global elites.

Dean Yates can tell you what US "assurances" are worth. He was the Reuters bureau chief in Baghdad on the morning of July 12, 2007 when his Iraqi colleagues Namir Noor-Eldeen and Saeed Chmagh were killed, along with nine other men, by US Army Apache gunships. Two children were seriously wounded. The US government spent three years lying to Yates, Reuters and the rest of the world about the killings, although the army had video evidence of the massacre taken by the Apaches during the attack. The video, known as the Collateral Murder video, was leaked in 2010 by Chelsea Manning to Assange. It, for the first time, proved that those killed were not engaged, as the army had repeatedly insisted, in a firefight. It exposed the lies spun by the US that it could not locate the video footage and had never attempted to cover up the killings.

The Spanish courts can tell you what US "assurances" are worth. Spain was given an assurance that David Mendoza Herrarte, if extradited to the US to face trial for drug trafficking charges, could serve his prison sentence in Spain. But for six years the Department of Justice repeatedly refused Spanish transfer requests, only relenting when the Spanish Supreme Court intervened.

The people in Afghanistan can tell you what U.S "assurances" are worth. US military, intelligence and diplomatic officials knew for 18 years that the war in Afghanistan was a quagmire yet publicly stated, over and over, that the military intervention was making steady progress.

The people in Iraq can tell you what US "assurances" are worth. They were invaded and subject to a brutal war based on fabricated evidence about weapons of mass destruction.

The people of Iran can tell you what US "assurances" are worth. The United States, in the 1981 Algiers Accords, promised not to interfere in Iran's internal affairs and then funded and backed The People's

Mujahedin Organization of Iran (MEK), a terrorist group, based in Iraq and dedicated to overthrowing the Iranian regime.

The thousands of people tortured in US global black sites can tell you what US "assurances" are worth. CIA officers, when questioned about the widespread use of torture by the Senate Intelligence Committee, secretly destroyed videotapes of torture interrogations while insisting there was no "destruction of evidence."

The numbers of treaties, agreements, deals, promises and "assurances" made by the US around the globe and violated are too numerous to list. Hundreds of treaties signed with Native American tribes, alone, were ignored by the US government.

Assange, at tremendous personal cost, warned us. He gave us the truth. The ruling class is crucifying him for this truth. With his crucifixion, the dim lights of our democracy go dark.

*This first appeared on Scheerpost.*

*Chris Hedges is a Pulitzer Prize-winning journalist who was a foreign correspondent for fifteen years for The New York Times, where he served as the Middle East Bureau Chief and Balkan Bureau Chief for the paper. His books include American Fascists: The Christian Right and the War on America, Death of the Liberal Class, and War is a Force That Gives Us Meaning and Days of Destruction, Days of Revolt, a collaboration with comics artist and journalist Joe Sacco.*

EXHIBIT "C"

A- Interview of U.N. Special Rapporteur on Torture, Professor of International law at Glasgow University, Human Rights Chair at the Geneva Acadamy, and former Senior Security policy advisor for the Swiss Government, Nils Melzer, on RT, October 30, 2021, titled "If Julian Assange dies, he would have been tortured to death" Nils' evidence was used in Julian Assange's trial. He is a foreigner, so his English can sometimes use some help. I have transcribed his interview as faithfully as possible with the use of Closed Captions.

Nils Melzer, (NM): "The actual discussion is that he should not even be in prison. Why is he being indicted in the first place, given that he has not committed any crime?"

RT: " Well as you know, Special Rapporteur, he is a flight risk because he sought political asylum and gained it in London, and all his journalism does not protect him from the U.S. Espionage Act, that's was Judge Barraitser has said, and that's why it's only his health that's a consideration.

NM: "I'm really glad you mentioned that because that's the scandal in this case. If you look at that first instance,(trial), that's not a victory for Julian Assange defense, or press freedom for that matter. It is a trap. Because a legal proceeding for extradition always goes through two or three instances, (trials). By not extraditing him at the first level, what that did, legally speaking, is put the U.S. in the position to appeal. Otherwise, had the ruling been to extradite, then Julian Assange would have appealed, and he would have brought all these questions of press freedom, of political offense, and motivation in that prosecution: the attempts of assassination and kidnapping he would have brought to the High Court level, where you have judges with a much stronger independence and expertise. But it was quite smart by the U.S. and the U.K to have it arranged the other way, so they don't extradite him at trial, they basically conform the whole narrative around the Espionage Act accusations and set the precedent to criminalize investigative journalism. But they will only bring those questions to the Appeals Court that they want to have reconsidered, which is Julian Assange's State of health and their prison conditions." .....

"The Espionage Act in the U.S is a scandal. The Official Secrets Act in the UK is a scandal. Because both of them criminalize the disclosure irrespective of public interest.".....(my, Plf's, words here: -because the very nature of the Espionage Act prohibits the defendant from stating the public's interest at trial.)

RT: "Just to be clear, if you were to suddenly (place) on TV in London, a Reuters journalist being gunned down by US helicopter gunships, (Wikileaks Collateral Murder video, 2010), both of us could be tortured, we could be subject to a U.S. Sec. of State claiming that we are non-state hostile actors, worth of assassination on the streets of London. (and) could be extradited, that precedent has already been set, it's just the suicide right (now). "

NM: "Think of the murder of George Floyd which was recorded on video. Only because of that video...caused public protests which made it so authorities could not avoid prosecuting those officers. Unfortunately in this case of Collateral Murder, there has been a completely different narrative, of the US fighting terrorism and it's very very difficult for an average citizen, who doesn't have privileged access to what actually happens behind the curtains of our policy making. They actually believe that narrative. It's very difficult for lay people to actually understand the full picture if they believe what the Main Stream press is telling them."

RT: "When you started your UN investigation into the case of Julian Assange, you weren't alone, but today every major human rights and free speech organization in the world backs your allegations. Why then do you think it's not a bigger Mainstream Media story?

NM: "I cannot speak for them. I think it's a scandal that it isn't. Because this is absolutely the key case on press freedom; of freedom of expression. But far beyond that on human rights, on human

Exh. "C"

dignity, on the integrity of our Rule of Law institutions: the judiciary, the independence of our judiciaries. Transparency, the Right to know: That people have to know what their governments are doing with their tax money, and the power that we the people delegate to our governments. This is about our rights, about our ability to oversee and control the integrity of our govt., because if that becomes a crime, what Julian Assange has done [sic]. And nothing he has been accused of, except receiving and publishing evidence of war crimes, nothing has been proven. This thing about him having blood on his hands is ridiculous because we know that the US Govt., for more than a decade, has not been able to advance a single case of an individual who may have been put in danger because of WikiLeaks publications.  We know now that Julian Assange was not even the first person who published those unredacted files. He made them accessible on WikiLeaks after they had been made accessible by the password being published by the two Guardian journalists. And he did so only after he had made contact with the Whitehouse and tried to do damage control (my words, warn them. He actually called Sec. Clinton's office before publication.) because of the password leaks.  What we know, is that the evidence that he published, that it's not about people being threatened.  It's about people being tortured, people being raped and people being murdered in front of a running camera.  And those people have never been prosecuted and so this is about protecting the impunity of criminals. And corrupt politicians, [sic] so they want to intimidate the person who came up with a genius idea of how to use the internet to allow whistleblowers to remain anonymous while transmitting millions of files that prove govt. misconduct.  Obviously, if that proliferates, then the Security establishment will have to pack up and have to start being subject to democratic oversight, respect the rule of law.  And that's just todays reality."

RT:  "Julian Assange did not look well. What would it mean for ...journalism if he, and it's probably time now where we start asking this: What if he dies in Belmarsh under the jurisdiction of British authorities?"

NM:  "Well if he should die in prison, he has effectively been tortured to death.  That's the reality of it.  And I had two forensic doctors with me and a psychiatrist evaluating him for 4 hours, and we all independently from each other, came to these conclusions at the same time.  And sure enough, after we left the prison, he entered the downward spiral.  And you cannot get someone to recover from torture as long as you continue to torture them.  And that is exactly what they do: they isolate him, they keep him in that limbo.  And just to keep this straight for everybody, Julian Assange is not serving a sentence. He's not even accused of anything that would be criminal.  He is being held in extradition detention,.. He does not need to be in Belmarsh."

# Julian Assange has a stroke in Belmarsh prison: Fiancée blames extreme stress caused by US extradition battle

- **Julian Assange had a stroke in Belmarsh Prison, his fiancee Stella Moris revealed**
- **WikiLeaks publisher, 50, is being held on remand in the maximum-security jail**
- **It is believed the mini-stroke was triggered by the stress of the US court action**
- **Stroke happened at the time of High Court appearance via video link in October**

By SARAH OLIVER FOR THE MAIL ON SUNDAY
PUBLISHED: 17:03 EST, 11 December 2021 | UPDATED: 20:50 EST, 11 December 2021

Julian Assange has had a stroke in Belmarsh Prison, his fiancee Stella Moris revealed last night.

The WikiLeaks publisher, 50, who is being held on remand in the maximum-security jail while fighting extradition to America, was left with a drooping right eyelid, memory problems and signs of neurological damage.

He believes the mini-stroke was triggered by the stress of the ongoing US court action against him, and an overall decline in his health as he faces his third Christmas behind bars.
It happened at the time of a High Court appearance via video link from Belmarsh in October. bars.

A 'transient ischaemic attack' – the interruption of the blood supply to the brain – can be a warning sign of a full stroke. Assange has since had an MRI scan and is now taking anti-stroke medication.

Ms Moris, 38, a lawyer, said: 'Julian is struggling and I fear this mini-stroke could be the precursor to a more major attack. It compounds our fears about his ability to survive the longer this long legal battle goes on.

'It urgently needs to be resolved. Look at animals trapped in cages in a zoo. It cuts their life short. That's what's happening to Julian. The never-ending court cases are extremely stressful mentally.'

She said he was kept in his cell for long periods and was 'short of fresh air and sunlight, an adequate diet and the stimulus he needs'.

Assange faced a major legal setback on Friday when the High Court overturned a judgment made this year preventing extradition to the US to face charges under the US Espionage Act.

His lawyers successfully argued he would be kept in conditions in the US that could lead to a serious risk of suicide. The High Court reversed the earlier ruling after the US

But Ms Moris said: 'I believe this constant chess game, battle after battle, the extreme stress, is what caused Julian's stroke on October 27.

He was feeling really unwell, far too ill to follow the hearing, and he was excused by the judge but could not leave the prison video room.

'It must have been horrendous hearing a High Court appeal in which you can't participate, which is discussing your mental health and your risk of suicide and in which the US is arguing you are making it all up.

'He had to sit through all this when he should have been excused. He was in a truly terrible state. His eyes were out of synch, his right eyelid would not close, his memory was blurry.'

Assange was examined by a doctor, who found a delayed pupil response when a light was shone into one eye – a sign of potential nerve damage.

Ms Moris and Assange have two sons, Gabriel, four, and Max, two, and have been engaged for five years. She said he had 'more or less' recovered – but she fears the attack shows his health is failing.

She visited him for around an hour yesterday, taking the children to see him in a prison hall shared by dozens of inmates and their loved ones.

She said Assange was distressed about being kept from his family, adding: 'He finds the prospect of a third Christmas in prison difficult.'

The US wants Assange to face allegations of conspiracy to obtain and disclose national defence information after Wikileaks published hundreds of thousands of leaked documents relating to the Afghanistan and Iraq wars.

He sheltered at the Ecuadorian Embassy in London in 2012 because he feared extradition, staying for seven years until he was forcibly removed and sent to Belmarsh in 2019.

He has until December 23 to appeal against last week's judgment, and could face many months – potentially years – on remand in the UK.

Ms Moris said: 'It remains an outrage that someone who is not serving a prison sentence should be held in prison for years on end.

'Julian is not a threat to anyone and it is a complete disregard to his individual liberty and our right to a family life.

'The US plays dirty every step of the way – it's a war of attrition. We can see from the fact that he has suffered a mini-stroke this is having a dangerous impact on him.'

A spokesman for the Ministry of Justice said last night he would not comment on an individual prisoner.

EXHIBIT "E"

JULIAN ASSANGE'S AWARDS FOR JOURNALISM

The Economist, New Media Award, 2008
Amnesty International, New Media Award, 2009
Time Magazine Person of the Year, People's Choice Award, 2010
Sam Adams Award for Integrity, 2010
Walkley Award: Australia's Pulitzer Prize, Award for Most Outstanding Contribution to Journalism, 2011
Martha Gelhorn Prize for Journalism, 2011
Sydney Peace Foundation, Gold Medal, 2011
Blanquerna Award for Best Communicator, 2011
Jose Cousa Press Freedom Award, 2011
Voltaire Award for Free Speech, 2011
Int'l Pierro Passetti Journalism Prize of the National Union of Italian Journalists, 2011
Privacy International, Hero of Privacy, 2012
Yoko Ono Lennon Courage Award for the Arts, 2013
Brazilian Press Association Human Rights Award 2013
Global Exchange Human Rights People's Choice Award, 2013
Kazakstan Union of Journalists Top Prize, 2014
Daphne Galizia Prize for Journalists, Whistleblowers and Defenders of the Right to Information 2019
Sacco-Vanzetti Memorial Award for Social Justice, 2019
Gaven MacFadyen Award, 2019
Danny Schechter Global Vision Award for Journalism and Activism, 2019
Catalan Dignity Commission's Dignity Award, 2019
Journalists Club of Mexico's International Journalism Award, 2019
Stuttgart Peace Prize, 2020
Gary Webb Freedom of the Press Award, 2020
Austrian Journalist Association's Dr. Karl Renner Solidarity Prize, 2021

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This packaging is not for resale. EP13F © U.S. Postal Service; May 2020; All rights reserved.

**UNITED STATES POSTAL SERVICE** ®

**PRIORITY MAIL EXPRESS** ®

CUSTOMER USE ONLY

FROM: (PLEASE PRINT) PHONE ( 360 ) 540 0996

SAMUEL E. Bull
618 W. Hazel
Mt. Vernon, WA 98273

MAR 01 2022
LODGED
RECEIVED

DELIVERY OPTIONS (Customer Use Only)
☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE ( )

U.S. District Court Clerk
Room 3100
1717 Pacific Ave
Tacoma, WA 98402

ZIP + 4® (U.S. ADDRESSES ONLY)

☞ PEEL FROM THIS CORNER

- For pickup or USPS Tracking™, visit USPS.com® or call 800-222-1811.
- $100.00 insurance included.

EP13F May 2020
1/2 x 9 1/2

**PRIORITY MAIL EXPRESS** ®

**ORIGIN** (POSTAL SERVICE USE ONLY)

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 98273 | 3/1/22 | $ 26.95 |

☐ 1-Day ☐ 2-Day ☐ Military ☐ DPO

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 1/28/22 | ☐ 10:30 AM ☑ 3:00 PM | $ | $ |

| Time Accepted | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|
| 3:03 ☐ AM ☑ PM | $ 3.05 | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | $ 30.00 |

| Weight | Flat Rate | Acceptance Employee Initials |
|---|---|---|
| 6 ozs. | ☑ | P4 |

| DELIVERY (POSTAL SERVICE USE ONLY) | | |
|---|---|---|
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature |

LABEL 11-B, MAY 2021   PSN 7690-02-000-9996

EI 150 737 105 US



**POSTAL SERVICE** ®

**UNITED STATES POSTAL SERVICE** ®

**MAIL**
**PRESS** ®

**FLAT RATE**
**ENVELOPE**
**RATE ▪ ANY WEIGHT**

Schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

Facebook.com/USPS  Twitter.com/USPS  Instagram.com/USPS